IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| CHRISTOPHER BROWN, | CASE NO. 3:23-CV-00389-BYP |
| Petitioner, | JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN JERRY SPATNY, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

### INTRODUCTION

Representing himself, Petitioner Christopher Brown, a prisoner in state custody, seeks a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). The District Court has jurisdiction over the petition under § 2254(a) and the matter was referred to me to prepare a Report and Recommendation. (Non-document entry of Mar. 31, 2023). I stayed the case from June 27, 2023 through May 14, 2024 while Mr. Brown exhausted available state-court remedies for his post-conviction claims. (ECF #10 and 13). On July 15, 2024, then-Respondent Warden Keith Foley,[1] as Warden of the Grafton Correctional Institution (hereinafter, the State), filed the Return of Writ, including the state-court record and trial transcripts. (*See* ECF #14, 14-1, and 15-1).

On September 13, 2024, Mr. Brown filed his "Motion For Leave To File A Combined Habeas Rule 7 And 8 Motion/Request To Expand The Record And A Motion/Request For An

---

[1]     Jerry Spatny since replaced Keith Foley as the Warden of the Grafton Correctional Institution, and so I automatically substituted him as the Respondent. (*See* ECF #23 at PageID 1205, n.1).

Evidentiary Hearing" that the State opposed. (ECF #18, 19).. On October 1, 2024, Mr. Brown submitted his Traverse to the State's Answer (ECF #20) and then filed his "Motion For Leave To Amend Previously Filed 'Combined Habeas Rule 7 And 8, Request To Expand The Record With A Copy Of The Bill Of Particulars And Petitioner's Affidavit, And Request For Evidentiary Hearing.'" (ECF #21). On November 20, 2024, I denied the motions. (ECF #23). Mr. Brown's petition is now decisional.

For the reasons below, I recommend the District Court **DISMISS** Ground Five as procedurally defaulted, **DENY** Grounds One through Four as meritless, and **DISMISS** the petition. Finally, I recommend the District Court **DENY** Mr. Brown a certificate of appealability as to all grounds.

## Procedural History

### I.    State court factual findings

The Ohio Court of Appeals, Sixth Appellate District, set forth the facts of this case on direct appeal. These factual findings are presumed correct unless Mr. Brown rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Sixth District determined:

> {¶2} On March 21, 2019, appellant was indicted on four counts of rape in violation of R.C. 2907.02(A)(1)(b) and (B), felonies of the first degree, two counts of rape in violation of R.C. 2907.02(A)(2) and (B), felonies of the first degree, and one count of corrupting another with drugs in violation of R.C. 2925.02(A)(4)(a), a felony of the second degree. According to the indictment, the incidents of rape giving rise to the four charges under R.C. 2907.02(A)(1)(b) occurred during a period of time spanning October 1, 2013 through January 16, 2016, during which A.K., the victim of the rapes and appellant's stepdaughter, was less than 13 years of age. The remaining rape counts and the corrupting count were premised upon conduct that allegedly took place during a period of time spanning January 17, 2016, through December 31, 2016.

2

{¶3} One week after the indictment was filed, appellant appeared before the trial court for arraignment, at which time he entered a plea of not guilty to all charges contained in the indictment. Thereafter, the matter proceeded through discovery and motion practice, culminating in a three-day jury trial that commenced on February 10, 2020. At trial, the state and appellant each called three witnesses, and appellant elected to take the stand in his own defense.

{¶4} As its first witness, the state called A.K. A.K. testified that she was born in January 2003, making her 17 years old at the time of trial. When she was 12 years old, A.K. moved into her grandfather's house, where she lived with appellant.

{¶5} When asked whether anything uncomfortable ever happened to her while living with appellant, A.K. responded in the affirmative and proceeded to describe several incidents of sexual abuse. Specifically, A.K. testified that appellant would take her into a recreation room in the home and engage in sexual acts with her. A.K. went on to state: "And he took—he never—at this point whenever he first started it, he didn't insert like his penis in me, but he took this nose inhaler thing and would rub it against my vagina." A.K. went on to indicate that appellant penetrated the folds of her vagina with the inhaler, and that this occurred "two or three times" at her grandfather's house. A.K. testified that she felt "stuck" and that she could not refuse appellant, or else he would get upset.

{¶6} As A.K. continued her testimony, she described a barn that she called "Sam's barn," which housed animals. A.K. testified that she helped appellant care for the animals inside Sam's barn. On one occasion while she was assisting with the animals, appellant took A.K. into a nearby camper and engaged in sexual acts with her. Specifically, A.K. testified that, on one occasion, appellant pulled down her pants and licked her vagina. Further, A.K. stated that appellant "would take out his penis and * * * he would rub it up and down my private part." A.K. testified that appellant's penis penetrated the folds of her vagina. When asked if these sexual acts happened on more than one occasion, A.K. responded that this occurred "multiple times."

{¶7} Turning to a subsequent incident that occurred after she moved from her grandfather's house, A.K. recounted that appellant asked her if she wanted to "play," which she understood to be a reference to sexual acts from her prior interactions involving appellant. A.K. agreed, and took her pants off. Appellant proceeded to insert a vibrator in A.K.'s vagina. According to A.K., appellant then pulled down his pants and engaged in intercourse with her. A.K. went on to state that appellant had intercourse with her on two occasions, and further stated that he would masturbate, including rubbing his penis in and around the folds of her vagina, "every night or every day that he got the chance that [A.K.] and [appellant] were alone."

{¶8} As its second witness, the state called Dr. Randall Schlievert. Upon certification as an expert in the field of child abuse and neglect, Schlievert indicated that half of

3

all child sexual abuse cases involve the kind of delayed disclosure of such abuse that occurred in this case. He then went on to describe several common reasons for the delay in disclosing sexual abuse, including manipulation on the part of the abuser, and explained that child victims are sometimes dependent upon their abusers and thus remain in contact with such persons after the abuse. On cross-examination, Schlievert acknowledged that he was not asked by the state to examine A.K., and thus he was unable to speak to any of the particulars of this case.

{¶9} For its third and final witness, the state called A.K.'s mother, S.B. S.B. stated that she and her children (including A.K.) moved from Tennessee to Toledo in October 2013, when A.K. was ten years old. Initially, S.B. and her children moved in with S.B.'s sister. However, one month after she moved to Toledo, S.B. began to live with her father on Parkwood Avenue in Toledo. Shortly thereafter, appellant also moved in with S.B.'s father.

{¶10} According to S.B., she worked at Sam's Deli in Toledo for a short period while she was on welfare. S.B. identified the barn and camper that were referenced by A.K. during her testimony, and noted that the barn and camper were located down the street from Sam's Deli.

{¶11} As S.B. continued her testimony, she acknowledged that she struggled with drug abuse issues at the end of 2013 and the beginning of 2014. She testified that she and appellant abused Percocet together. Eventually, in May or June 2014, S.B., appellant, and S.B.'s children moved out of S.B.'s father's home and into an apartment on Chase Street in Toledo. Thereafter, S.B.'s drug abuse worsened, as did appellant's.

{¶12} When asked if she ever suspected that appellant was sexually abusing A.K., S.B. stated: "There was one incident where he was always [locking] the door with her in it, and every time I try to come home and open the bedroom door, [it] was always locked." S.B. further described in incident in which she "opened the door and it looked like her head come flying out of the covers really fast. I could kind of tell that he was a little nervous and I just kind of like, I didn't know what to say." Thereafter, A.K. began reporting information about the sexual abuse to S.B. in a piecemeal fashion, which led S.B. to set up a meeting with Toledo Police Department detective Diane Trevino in December 2018. A.K. set forth her allegations of sexual abuse at this meeting, leading Trevino to launch an investigation that culminated in the referral of the matter to the state for eventual prosecution.

{¶13} At the conclusion of S.B.'s testimony, the state rested. Appellant then moved for an acquittal under Crim.R. 29, which was denied by the trial court. Thereafter, the matter proceeded to appellant's case-in-chief.

4

{¶14} As his first witness, appellant called Detective Trevino to the stand. Trevino testified that she met with S.B. and A.K. in December 2018, at which time she interviewed S.B. and A.K. separately. According to Trevino, A.K. alleged that she was sexually abused by appellant at her Chase Street address, but failed to disclose any incidents of sexual abuse at her grandfather's house or at the camper located near Sam's Deli. Trevino also interviewed appellant in January 2019. During the interview, appellant told Trevino that A.K.'s sexual abuse claims were fabricated in retaliation for his decision to stop paying her mobile phone bill.

{¶15} On cross-examination, Trevino noted that A.K. was living at the Chase Street address at the time of her interview. Additionally, Trevino testified that, in her experience, it is common for child sex abuse victims to reveal facts regarding their abuse over time, little by little. Ultimately, Trevino conceded that the testimony previously provided by A.K. was consistent with the statements A.K. made during her interview with Trevino in December 2018.

{¶16} For his second witness, appellant called A.K.'s grandfather's husband, J.M. J.M. testified that A.K., her mother, and her siblings moved into his Parkwood Avenue home in August 2013, followed three months later by appellant. The family resided in J.M.'s home until June 2014. While they resided in J.M.'s home, appellant and S.B. slept in the garage, which was converted into a recreation room. The children, including A.K., slept in another bedroom.

{¶17} At some point, S.B.'s relationship with her father and J.M. deteriorated to the point where the family was asked to leave the home. Appellant eventually moved back into J.M.'s home after separating from S.B. in 2018. Thereafter, in early November 2018, A.K. asked to stay the night with appellant at J.M.'s residence. J.M. testified that he denied A.K.'s request, because he thought it would be inappropriate to have her stay in the home with three men.

{¶18} After J.M. finished his testimony, appellant called A.K.'s grandfather, T.M. T.M. corroborated J.M.'s testimony, and further stated his belief that it would not have been possible for appellant to have sexually abused A.K. in his home, because "at any given time there was either myself or my husband or both of us in that household at all times."

{¶19} As his final witness, appellant took the stand. Appellant testified that he took care of A.K. during lengthy periods of time in which S.B. was absent from the home due to drug abuse. However, appellant stated that he moved out of the Chase Street home and into J.M.'s home in 2018, because he "got tired of [S.B.'s] drug use and her cheating on [him] on a regular basis."

{¶20} Appellant was asked to describe his relationship with A.K., to which he responded that he occasionally fought with her over school-related issues. Appellant

characterized his relationship with A.K. as a "normal father, daughter relationship." Throughout his testimony, appellant denied that anything sexual ever took place between him and A.K. When asked why he believed A.K. would make sexual abuse allegations against him, appellant posited that A.K. was upset that he had filed for divorce from S.B. and refused to continue paying her mobile phone bill.

{¶21} On direct examination, appellant revealed that he had filed a complaint for divorce from S.B., but had not yet obtained the divorce because "I missed both my court dates since I have been in jail * * *." This comment prompted the state to seek a sidebar conference, at which the state voiced its concern over appellant revealing the fact that he was incarcerated. The state argued that this comment constituted invited error, and appellant's defense counsel agreed. Ultimately, the trial court offered to provide the jury with a limiting instruction, but defense counsel rejected the offer, electing instead to "leave it alone."

{¶22} At the close of appellant's case-in-chief, defense counsel reasserted his Crim.R. 29 motion for acquittal, which was denied by the trial court. The trial court then instructed the jury, the parties provided their closing arguments, and the jury began its deliberations. During deliberations, the jury wrote a note to the trial court, asking whether it was permissible for them to access the internet from their mobile phones for the purpose of ascertaining the definition of the word "access," a term that appears in the elements of the charge of corrupting another with drugs that was contained in the indictment. The court responded in the negative, but the jury subsequently notified the court that one of the jurors had already researched the meaning of "access."

{¶23} Upon receiving this information and sharing it with the parties, the court informed appellant that:

> [T]his alone would serve as a foundation for you to ask for a mistrial, which would, if granted, mean the Jury is discharged and your case would start over with a new trial. An alternative to that is to bring the Jury out, find out exactly what this, in their words, unauthorized research dealt with, and it may or may not be viewed as impactful and you may make the considered decision that you're comfortable going forward with this Jury deliberating. That said, both you and the State would have the ability to request that I grant a mistrial.

The court went on to verify that appellant had an opportunity to confer with defense counsel on this issue.

{¶24} Initially, defense counsel argued in favor of a mistrial. In response, the state requested a voir dire of the jury to ascertain the extent of the issue. The court then proceeded to bring the jury into the courtroom for questioning. The foreperson

revealed that the jury could not agree on the definition of access pertaining to Count 7 (corrupting another with drugs), and that they collectively decided to find a definition of that word on the internet. The court then questioned each juror individually (in the presence of the rest of the jury) to ensure that no further research was performed. The court admonished the jury for violating its instructions, noting that their research "was highly improper." Thereafter, the court ordered the jury to return to the jury room, and resumed its discussions with the parties.

{¶25} At this point, the state offered to dismiss the charge of corrupting another with drugs in order to "correct the taint" brought about by the jury's independent research. Following a private discussion with appellant as to his options in light of the state's offer and the jury's explanation of what occurred during deliberations, defense counsel informed the court:

> Against my counsel and advice, I advised my client that a mistrial is warranted simply because of the taintedness of more than one Juror as a result of the collective request for the definition as to "access." But, my client, Your Honor, does not want a mistrial. So, against my counsel and advice, my client wants to proceed with this trial, with the continued deliberations with the current Jury panel of twelve. He does though make a request that based upon the obvious * * * violation of this Court's instruction as to having electronic media, that Count 7 is tainted. We would ask the court to dismiss that count due to what the Jury has represented to the Court. But my client is not asking for a mistrial as to Counts 1 through 6.

{¶26} The court then questioned appellant as to his wishes, and appellant confirmed that defense counsel accurately indicated his desire not to seek a mistrial and to have Count 7 dismissed. The state agreed to dismiss Count 7, and the trial court allowed the jury to continue deliberating after dismissing the charge of corrupting another with drugs.

{¶27} Ultimately, the jury returned with a verdict of guilty on four counts of rape, two of which related to incidents that occurred at T.M.'s home when A.K. was under the age of 13, and two of which related to incidents that occurred at the Chase Street apartment after she turned 13. The jury was unable to reach a unanimous verdict as to the remaining rape counts, which related to the sexual conduct that allegedly occurred inside the camper adjacent to Sam's barn. Thereafter, the trial court continued the matter for sentencing.

{¶28} At sentencing, the state asked the trial court to dismiss Count 7 and the two rape counts on which the jury could not reach a unanimous verdict. The court agreed, and dismissed those charges without prejudice. Thereafter, the court ordered appellant to serve ten years to life as to each of the two counts of rape in violation of

R.C. 2907.02(A)(1)(b) and (B), and ten years as to each of the other two counts of rape in violation of R.C. 2907.02(A)(2) and (B), all to be served consecutively, for a total sentence of 40 years to life.

(ECF #14-1 at PageID 209-18; *see also State v. Brown*, No. L-20-1052, 2021 WL 1943266 (Ohio Ct. App. May 14, 2021) (footnote omitted, ellipses and alterations in original), *delayed appeal not allowed*, 177 N.E.3d 987 (Ohio 2021) (table)).

## II.  Direct appeal

On March 4, 2020, through new counsel, Mr. Brown timely appealed to the Sixth District. (ECF #14-1 at PageID 158). He raised four assignments of error:

1.  The Trial Court abused its discretion in failing to order a mistrial as a result of juror misconduct.

2.  Appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

3.  The evidence presented at trial was insufficient to support any of the convictions.

4.  The Jury's finding of guilty was against the manifest weight of the evidence.

(*Id.* at PageID 171, 174, 176-77). In May 2021, the Sixth District affirmed Mr. Brown's convictions. (*Id.* at PageID 209-18; *see also Brown*, 2021 WL 1943266).

On July 28, 2021, representing himself, Mr. Brown sought leave from the Supreme Court of Ohio to submit a delayed appeal. (ECF #14-1 at PageID 234-36). The court granted leave on September 28, 2021. (*Id.* at PageID 262). Mr. Brown's jurisdictional memorandum raised three propositions of law:

1.  The trial court errs to the prejudice of the Appellant in contravention of the Ohio and U.S. Constitutions and abuses its discretion when it defers to and leaves the ultimate decision up to the appellant concerning whether to move for a mistrial when he is represented by counsel that believes in the best interest of his client that he should request a mistrial.

8

2. Trial court errs to the prejudice of the Appellant and is deprived of the effective assistance of counsel when Appellant inadvertently reveals that he was in jail while testifying in his defense and counsel fails to request an instruction to the jury to disregard the comment.

3. Trial court erred to the prejudice of the Appellant when it allowed the Appellant to be convicted on insufficient evidence.

(*Id.* at PageID 264). On December 14, 2021, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID 282; *see also Brown*, 177 N.E.3d 987).

## III.  Application to reopen the direct appeal

While his delayed appeal was pending, on August 9, 2021, Mr. Brown applied to reopen his direct appeal under Ohio Appellate Rule 26(B). (ECF #14-1 at PageID 283). There, he argued his appellate counsel was ineffective for not raising six proposed errors by his trial counsel on direct appeal:

1. Trial counsel failed to utilize the video evidence of prior statements to impeach the State's key witnesses.

2. Trial counsel failed to utilize medical records to impeach the State's witnesses at trial.

3. Trial counsel failed to object to the exclusion of probative evidence in violation of Evid.R. 404.

4. Trial counsel failed to object to the State's use of other-acts evidence under Evid.R. 404(b).

5. Trial counsel filed to object to the alternate juror being the jury foreperson.

6. Trial counsel's strategy was so ill-chosen that it permeated the entire trial with error of constitutional magnitude.

(*Id.* at PageID 284, 286, 287) (cleaned up). On October 13, 2021, the Sixth District denied the application on the merits, concluding Mr. Brown's appellate counsel was not ineffective. (*Id.* at PageID 310-16). Mr. Brown did not appeal this decision to the Supreme Court of Ohio.

**IV.     State post-conviction petition**

On August 17, 2022, representing himself, Mr. Brown filed a delayed petition for post-conviction relief under Ohio Revised Code § 2953.21. (ECF #14-1 at PageID 317). There, he argued his trial counsel was ineffective for not discovering exculpatory evidence that he was not prescribed a nasal inhaler until 2017 after the State accused Mr. Brown of using an inhaler to rape A.K. in 2013. (*See id.* at PageID 320-25). The State sought summary judgment that the petition was untimely and the claims were meritless. (*Id.* at PageID 329). On April 12, 2023, the trial court dismissed Mr. Brown's petition, concluding Mr. Brown knew of his own medical history with inhalers that he claimed his counsel failed to discover and thus his filing delay could not be excused. (*Id.* at PageID 356-59).

On May 12, 2023, Mr. Brown appealed that decision to the Sixth District. (*Id.* at PageID 361). There, he raised four assignments of error, arguing:

1.    The trial court erred to the prejudice of Appellant and abused its discretion when it granted the State's Motion for Summary Judgment.

2.    The trial court erred to the prejudice of Appellant and abused its discretion when it failed to order an evidentiary hearing to determine whether Appellant was Unavoidably Prevented from Discovery of the Facts.

3.    The trial court erred to the prejudice of Appellant and abused its discretion when it reached the merits of the Petition without having first determined whether Appellant was Unavoidably Prevented from Discovery of the Facts.

4.    The trial court erred to the prejudice of Appellant and abused its discretion when it based the denial of the Petition on res judicata rather than determining whether it had jurisdiction to entertain the Petition.

(*Id.* at PageID 370). While this application was pending, I stayed Mr. Brown's habeas petition.

(ECF #10). On February 9, 2024, the Sixth District affirmed the denial of post-conviction relief.

(*Id.* at PageID 420-28; *see also State v. Brown*, No. L-23-1119, 2024 WL 513727 (Ohio Ct. App. Feb. 9, 2024), *appeal not allowed,* 233 N.E.3d 658 (Ohio 2024) (table)).

On March 21, 2024, representing himself, Mr. Brown appealed the Sixth District's judgment to the Supreme Court of Ohio, raising a single proposition of law:

> Whether the [State] should have been granted summary judgment and [Mr. Brown] denied an evidentiary hearing where the [State] failed to produce an affidavit from [Mr. Brown]'s trial counsel which was critical to the trial court's determination of material facts in dispute sharing a common nucleus of operative facts dispositive of the state's motion for summary judgment, *i.e.*, where [Mr. Brown]'s unavoidably prevented showing is subsumed in and an integral part of his ineffective assistance of counsel claim.

(*Id.* at PageID 438). On May 14, 2024, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID 462; *see also Brown*, 233 N.E.3d 648). That day, I lifted the stay. (ECF #13).

### Federal Habeas Petition

In his Petition, Mr. Brown raises five grounds for relief:

**GROUND ONE**: The trial court deprived Petitioner of due process of the law under the Federal Constitution, 14th Amendment when it failed to order a mistrial as a result of juror misconduct.

**Supporting facts**: As a result of independent research conducted during jury deliberations, the trial court was required to order a mistrial. All juror misconduct is presumed to be prejudicial, and the prevailing party has the burden to demonstrate that the misconduct was not prejudicial under the circumstances.

**GROUND TWO**: Petitioner was denied effective assistance of trial counsel, 5th and 6th Amendments of the U.S. Constitution.

**Supporting facts**: Trial counsel failed to ask for a limiting instruction after Petitioner inadvertently admitted from the stand that he was incarcerated during the pendency of the criminal case.

**GROUND THREE**: The trial court deprived Petitioner of due process of law under the 14th Amendment of the U.S. Constitution when it allowed a conviction to be had on insufficient evidence.

11

**Supporting facts**: This case was a "she said, he said" case. There was no evidence upon which the jury could rely to reach a decision to convict beyond a reasonable doubt where credibility is paramount combined with trial counsel's failure to object to other acts evidence.

**GROUND FOUR**: Ineffective assistance of appellate counsel for failure to raise ineffective assistance of trial counsel.

**Supporting facts**: Trial counsel failed to utilize video evidence of prior inconsistent statements to impeach A.K. Trial counsel failed to utilize medical records to impeach A.K.'s testimony. Trial counsel failed to object to the exclusion of prob[a]tive evidence in regards to [S.B.2][2] and his daughter to show where A.K. got her story from. Trial counsel failed to object to jury foreman being the alternate juror. Trial counsel's strategy as a whole permeated the entire trial with unfairness. In the initial video interviews with A.K. she never mentioned a "nasal inhaler."

**GROUND FIVE**: Ineffective assistance of trial counsel due to his failure to discover exculpatory evidence.

**Supporting facts**: Trial counsel either failed to investigate or his strategy was so ill-chosen that it permeated the entire trial with obvious unfairness. Petitioner had evidence that was exculpatory in nature where counsel failed to elicit from Petitioner that Petitioner never used, possessed or owned a "nasal inhaler" prior to the year 2017, which suggests that the State's theory is inconsistent with the physical evidence as it relates to the two rape convictions that carry the life sentences. Whereas, Counts 1 and 2 were specifically premised upon the penetration of A.K. with the alleged "nasal inhaler" between the years 2013 and 2016.

(ECF #1 at PageID 5-12)

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Brown's habeas petition. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."

---

[2]       Two S.B.'s appear in the proceedings: A.K.'s mother (S.B.) and a third party (designated here as S.B.2) who Mr. Brown argues is an alternative suspect for the rapes.

*Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citation and quotation omitted). Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991).

Habeas relief cannot be granted unless a person is in custody pursuant to a state conviction that "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

For the purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state-court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Id.* at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005). The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Williams*, 529 U.S. at 405. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision involves an unreasonable application of the Supreme Court's precedent if the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the state prisoner's case, or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. The appropriate measure of whether a state-court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under § 2254(d)(2), state court factual determinations stand unless they are objectively unreasonable in light of the evidence presented in state court. *Id.* at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18. Under AEDPA, "a determination of a factual issue made by a state court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1).

Comity principles also require federal courts to defer to a state's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing de novo questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007).

### PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers, including exhaustion of state remedies and procedural default, limit a petitioner's access to review on the merits of a constitutional claim. *Daniels v. United States*, 532 U.S. 374, 381 (2001). Put simply, federal courts may review federal claims that were evaluated on the merits by a state court. Claims there were not evaluated on the merits, either because they were never presented to the state courts (*i.e.*, they are unexhausted) or because they were not properly presented to the state courts (*i.e.*, they are procedurally defaulted),

are generally not cognizable on federal habeas review. *Bonnell v. Mitchel*, 301 F.Supp.2d 698, 722 (N.D. Ohio Feb. 4, 2004).

**Procedural Default**. Absent a petitioner establishing either cause and prejudice or that failure to review the claim would result in a fundamental miscarriage of justice (discussed below), a federal court will not consider the merits of procedurally defaulted claims. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

There are two avenues by which a petitioner's claim may be procedurally defaulted. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). First, procedural default occurs if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.* Second, and as relevant here, a claim may be procedurally defaulted when the petitioner fails to raise it in state court and pursue it through the state's "ordinary appellate review procedures." *Id.*; *see also Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806.

**Excusing a Procedural Default by Showing Cause and Prejudice**. To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 749 (1991). A finding of cause and prejudice does not entitle a petitioner to habeas relief; it only allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted. *See Martinez v. Ryan*, 566 U.S. 1, 10 (2012); *see also Coleman*, 501 U.S. at 750.

Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012). Neither a petitioner's pro se status nor his ignorance of the law and procedural filing requirements are enough to establish cause to overcome procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).

To demonstrate prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice; rather, the petitioner must show that the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. *Murray*, 477 U.S. at 494. There is no prejudice where the petitioner does not show a reasonable probability that the result of the proceeding would have been different. *Ambrose v. Booker*, 801 F.3d 567, 577-78 (6th Cir. 2015).

**Actual Innocence Exception**. Alternatively, a petitioner may overcome procedural default by showing that a fundamental miscarriage of justice will occur if the claims are not considered. *Coleman*, 501 U.S. at 750. A fundamental miscarriage of justice occurs in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 495-96; *see also Schlup v. Delo*, 513 U.S. 298, 327 (1995). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A valid actual innocence claim must be supported by new reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

17

physical evidence, that was not presented at trial that is so strong a court cannot have confidence in the outcome of the petitioner's trial. *Schlup*, 513 U.S. at 324. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

ANALYSIS

The State argues first that Grounds Four and Five are procedurally defaulted because Mr. Brown did not present them to the Supreme Court of Ohio. (ECF #14 at PageID 111-12). The State further argues that all five grounds for relief are without merit. (*Id.* at PageID 119-41). Mr. Brown responds that cause and prejudice excuses the default of Ground Four and the default of Ground Five should be excused because he is actually innocent. (ECF #20 at PageID 1130-57). I begin with the procedural-default issue, concluding it is more appropriate to resolve Ground Four on the merits but Ground Five should be dismissed as procedurally defaulted. I then discuss the merits of the remaining claims, concluding Grounds One through Four are meritless.

**I.      Procedural default of Grounds Four and Five**

In his Traverse, Mr. Brown concedes that he procedurally defaulted Ground Four because he did not present that claim to the Supreme Court of Ohio (ECF #20 at PageID 1130) and procedurally defaulted Ground Five because he did not "meet the state's timeliness rules for postconviction relief" (*Id.* at PageID 1156). But he advances cause and prejudice to excuse his default of Ground Four (*id.* at PageID 1131-35) and argues the default of Ground Five should be excused under the actual-innocence exception. (*Id.* at PageID 1156-57). I address each in turn.

18

**A.** **The District Court should decline to reach whether Ground Four is procedurally defaulted and instead proceed to the merits.**

Mr. Brown concedes he procedurally defaulted Ground Four by not presenting his ineffective-assistance claims to the Supreme Court of Ohio but advances he had cause for his default because he was never served with the Sixth District's judgment entry denying his Ohio Appellate Rule 26(B) application. (ECF #20 at PageID 1130-31). Such a claim may serve as cause for a petitioner's procedural default in failing to file a timely appeal to the Supreme Court of Ohio. *See Hubbard v. Warden, London Corr. Inst.*, No. 1:09cv550, 2010 WL 3931500, at *5 (S.D. Ohio Sept. 7, 2010) (citing *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 433-35 (6th Cir. 2006)).

Taking Mr. Brown at his word that he "did not receive any legal mail from the Sixth District Court of Appeals," Mr. Brown states he first "found out that the application was denied about 40 days into the 45-day time limit through a case manager" and he "never thought that it would be decided so quickly or else he would have checked sooner." (*See* ECF #20 at PageID 1131-32). The Sixth District decided his Appellate Rule 26(B) application in just over two months: it was filed August 9, 2021 and decided October 13, 2021. (*See* ECF #14-1 at PageID 283, 310).

If Mr. Brown submitted his appeal on the day he learned of the denial with five days remaining, then he would have had sufficient cause to avoid procedural default even had the appeal arrived late and been denied as untimely. *See Maples v. Stegall,* 340 F.3d 433, 439 (6th Cir. 2003) (noting "[w]here a pro se prisoner attempts to deliver his petition for mailing in sufficient time for it to arrive timely in the normal course of events" that circumstance "is sufficient to excuse a procedural default based upon a late filing."); *see also Foster v. Warden, Chillicothe Correctional Inst.*, 575 F.App'x 650, 654 (6th Cir. 2014) ("Foster delivered his filing to prison

officials at least five days before it was due. Even allowing for a prison's mail procedures, five days certainly provided sufficient time for it to arrive timely in the normal course of events. This constitutes cause for Foster's procedural default.") (cleaned up).

Nevertheless, determining whether there was cause for the procedural default requires determining what actually transpired concerning notice of the appellate decision. But federal courts on habeas review do not have to address a procedural default issue before deciding the merits. *Hudson v. Jones,* 351 F.3d 212 (6th Cir. 2003). Other district courts faced with making a similar determination about a petitioner's notice have found it more expedient to proceed to the merits. *See, e.g., Smith v. Gansheimer,* No. 4:10-CV-2836, 2012 WL 6649198, at *10 (N.D. Ohio Nov. 29, 2012) (lack of notice of denial of Ohio Appellate Rule 26(B) reopening), *report and recommendation adopted,* 2012 WL 6628260 (N.D. Ohio Dec. 20, 2012); *Nicholson v. Morgan,* No. 3:20-CV-2545, 2022 WL 4072473, at *9 (N.D. Ohio Aug. 11, 2022) (same but analyzing prejudice rather than cause), *report and recommendation adopted,* 2022 WL 4017507 (N.D. Ohio Sept. 2, 2022); *Hamilton v. Sheldon,* No. 1:20-CV-02069, 2023 WL 8851636, at *8 (N.D. Ohio Oct. 13, 2023) (same under both cause and prejudice), *report and recommendation adopted,* 2023 WL 8828898 (N.D. Ohio Dec. 21, 2023).

Because Ground Four is an ineffective-assistance claim that can be straightforwardly adjudicated on the merits, I recommend the District Court decline to reach the issue whether Ground Four was procedurally defaulted and instead resolve it the merits. I discuss the merits of Ground Four later in this Report and Recommendation.

**B.    Mr. Brown has not demonstrated he is actually innocent to excuse the procedural default of Ground Five.**

Mr. Brown concedes in his Traverse that he "procedurally defaulted Ground Five due to his failure to meet the state's timeliness rules for post-conviction relief." (ECF #20 at PageID 1156). But he claims this default should be overlooked because he is actually innocent of two of the four rape convictions for engaging in sexual conduct with A.K with a nasal inhaler in 2013 because new evidence details that he was not prescribed his medical nasal inhaler until 2017 (ECF #20 at PageID 1139-40; ECF #21-1 at PageID 1193-94) and Detective Trevino's recorded interview of A.K. "wholly exonerated" him (*see* ECF #21-1 at PageID 1178).

I addressed Mr. Brown's actual-innocence argument in my November 20, 2024 order denying his motion to expand the record and hold an evidentiary hearing to develop his argument. (ECF #23 at PageID 1217-19). In that order, I laid out the applicable legal standard:

> In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court recognized a miscarriage-of-justice exception to procedural default. Under the exception, a petitioner's procedural default may be excused, thereby allowing the federal court to review the merits of the constitutional claim, if the petitioner makes a credible claim of actual innocence. *Id.* at 321. "Actual innocence" means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). To establish a credible claim of actual innocence, the petitioner must support his allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup*, 513 U.S. at 324.
>
> Prisoners asserting innocence as a gateway to defaulted claims must establish, in light of the new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. In assessing actual-innocence claims, a district court must survey "all the evidence, old and new, incriminating and exculpatory," and "based on this total record . . . must make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.*, at 327-28. Under this review, if the new evidence "raise[s] sufficient doubt about [the petitioner's] guilt to undermine the confidence in the result of the trial without assurance that the trial was untainted by constitutional error," then "a review of the merits of the constitutional claims" is justified. *House v. Bell*, 547 U.S. 518,

537 (2006) (quoting *Schlup*, 513 U.S. at 317). The standard is demanding and permits review only in extraordinary cases. *House*, 547 U.S. at 538.

(ECF #23 at PageID 1217-18). Against that backdrop, I found Mr. Brown's actual-innocence

argument unconvincing:

> The evidence Mr. Brown asserts to support his claim of actual innocence does not raise sufficient doubt about his guilt to undermine confidence in the result of the trial. First, I consider Mr. Brown's factual allegation that he did not own an inhaler during the timeframe of the alleged rapes in Counts 1 and 2. Described above, A.K. testified Mr. Brown took her to the recreation room in her grandfather's basement where he and A.K.'s mother slept and used "this nose inhaler thing" to penetrate her. (ECF #15-1 at PageID 697). A.K. never testified, and the State never asserted, that the nasal inhaler was Mr. Brown's. Even if the jury heard and accepted Mr. Brown's claim that he did not own an asthma inhaler until 2017 as true, it does not contradict A.K.'s testimony.
>
> Mr. Brown next asserts the videotaped recording of A.K.'s initial interview with Detective Trevino wholly exonerates him because A.K. "expressly implied she was raped by [S.B.2], not Petitioner." (ECF #21-1 at PageID 1178) (cleaned up). In his motion, Mr. Brown offers little detail about the recorded interview. Trial transcripts show that defense counsel asked A.K. about [S.B.2], whom she described as her best friend's stepfather. (ECF #15-1 at PageID 726). The State objected to the line of inquiry. (*Id.*). At sidebar, trial counsel argued [S.B.2] was relevant because "he is a convicted child molester and [A.K.] is hanging around the environment and so I think the Jury needs to know the environment that she is hanging around and that her mother is sleeping with a man who impregnated his 13-year-old daughter." (*Id.* at PageID 727). The court precluded such questions as not relevant to the allegations against Mr. Brown. (*Id.*). In his application to reopen the direct appeal, Mr. Brown described the interview and alleged that A.K. told Det. Trevino how her friend was raped by [S.B.2] and had his baby, then A.K. stated, "me too." (ECF #14-1 at PageID 284). I assume, for the purpose of this analysis, that Mr. Brown accurately described A.K.'s statements to Det. Trevino.
>
> After considering the total record, including this new evidence, I find Mr. Brown is not entitled to an evidentiary hearing to further develop his claim of actual innocence. At trial, A.K. testified Mr. Brown raped her multiple times over several years in at least three locations. *Brown*, 2021 WL 1943266, at *1-2. She acknowledged that, during her initial interview with Det. Trevino, she described some but not all of the alleged instances of sexual misconduct. (ECF #15-1 at PageID 737). Det. Trevino testified A.K. raised the allegations in a piecemeal fashion over time, which the detective described as common for child sex abuse victims, and confirmed that during her initial December 2018 interview, A.K. disclosed Mr. Brown sexually abused her at the Chase Street apartment but did not disclose the events at her

grandfather's house or at a camper. [*Brown*, 2021 WL 1943266,] at *2-3. Ultimately, Det. Trevino stated A.K.'s testimony at trial matched statements she made in 2018. *Id.* at *3. Even if A.K.'s alleged statement was presented to the jury, it does not follow that this evidence would lead a reasonable juror to acquit Mr. Brown. This is so because the statement itself does not exculpate Mr. Brown from the accusations of sexual abuse against him specifically or inculpate [S.B.2] as the perpetrator for those same accusations. At most, A.K.'s purported statement to Det. Trevino suggests she may have been victimized by both men at different times.

(ECF #23 at PageID 1219).

For the same reasons, Mr. Brown has not established a credible claim of actual innocence. First, to the extent he contends it was factually impossible for him to commit rape with a nasal inhaler in 2013 because he was not prescribed one until 2017, that argument is unconvincing. The Sixth Circuit suggested in a recent unpublished case a petitioner may make a sufficient showing with information that can "supply any alibi, point to any alternative perpetrator, or otherwise render the State's theory of the case impossible." *See Houston v. Davis*, No. 24-3280, 2025 WL 590895, at *3 (6th Cir. Feb. 24, 2025). But Mr. Brown's theory presupposes that the two nasal inhalers are the same. Nothing in the record supports that theory and, as stated above, A.K. testified the nasal-inhaler rape occurred at her grandfather's house and it is just as likely that the inhaler belonged to anyone else living in that house. Thus, Mr. Brown does not demonstrate it was impossible for him to have used a nasal inhaler in 2013, only that he was not prescribed one at the time. That does not create sufficient doubt that no reasonable juror would vote to convict.

Second, to the extent Mr. Brown's argument insinuates A.K. lied about the nasal inhaler or impeaches her memory, that argument also fails to demonstrate his actual innocence. A petitioner must "conclusively establish[] that he did not do the crime" and that "requires him to do more than only undermine the state's case." *Hubbard v. Rewerts*, 98 F.4th 736, 748 (6th Cir. 2024), *cert. denied*, No. 24-6180, 2025 WL 581742 (U.S. Feb. 24, 2025). Moreover, "[l]atter-day impeachment

23

evidence seldom, if ever, makes a clear and convincing showing that no reasonable juror would have believed the heart of the witness' account." *Sawyer v. Whitley*, 505 U.S. 333, 334 (1992). Thus, any argument that A.K. was not credible on the stand does not show Mr. Brown's actual innocence.

Third, although Mr. Brown does not expressly state S.B.2 is an alternative perpetrator, he implies as much in his argument. To the extent he argues he is innocent because S.B.2 committed the rapes, that argument is unconvincing. Mr. Brown overstretches A.K.'s statement of "me too" to Det. Trevino in response to how her friend was raped by S.B.2. Mr. Brown contends "me too" means A.K. was victimized by another man instead of by him. But, A.K.'s response could just as easily mean she was victimized by another man in addition to being victimized by Mr. Brown. "Me too" could also mean A.K. had been victimized like her friend, but not by S.B.2. In isolation, the statement is ambiguous. When taking all the evidence, old and new, and making a probabilistic decision as to how a jury would decide, a jury would rely on A.K.'s own testimony where she described being victimized multiple times by Mr. Brown to inform what "me too" meant. It is unlikely the jury would view one statement in the past that may or may not mean S.B.2 victimized her to mean A.K. was entirely untruthful on the stand.

I thus recommend the District Court **DISMISS** Ground Five as procedurally defaulted.

## II.     On their merits, Grounds One through Four each fail.

### A.     Ground One raising a due-process violation from juror misconduct and ineffective assistance of counsel in responding to that misconduct is without merit.

In Ground One, Mr. Brown argues the trial court denied him due process by not ordering a mistrial after jurors revealed they conducted independent research during deliberations. (ECF #1 at PageID 5). In his Traverse, he also casts Ground One as an ineffective-assistance claim, arguing

24

his trial counsel was ineffective for not convincing him to accept the offered mistrial. (*See* ECF #20 at PageID 1162-63).

>   The Sixth District ruled on Mr. Brown's juror-misconduct claim as follows:

>   {¶32} Ordinarily, we review the trial court's disposition of a defendant's allegation of juror misconduct for an abuse of discretion. However, in this case, we need not determine whether the trial court abused its discretion in failing to declare a mistrial, because we find that any error associated with such inaction was invited by appellant.

>   {¶33} Under the invited-error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make. Under this principle, a party cannot complain of any action taken or ruling made by the court in accordance with that party's own suggestion or request.

>   {¶34} Here, the trial court sua sponte raised the possibility of a mistrial based upon the jury's improper independent research during deliberations. In conjunction with its voir dire of the jury aimed at ascertaining the extent of the misconduct, the trial court asked appellant how he wished to proceed, and provided him with a range of alternatives to choose from, including a mistrial. Appellant then conferred with his defense counsel, who advised him to seek a mistrial. Against the advice of his counsel, appellant elected to proceed to a verdict on the rape counts and accepted the state's offer to dismiss the charge of corrupting another with drugs, which was the only charge related to the jury's independent research.

>   {¶35} In light of the facts of this case, it is clear that the trial court's failure to declare a mistrial was based upon appellant's own request. Therefore, any error associated with the trial court's failure to declare a mistrial was invited by appellant, and appellant cannot now complain of such error on appeal.

(ECF #14-1 at PageID 220-21) (quotations and citations omitted).

>   I must begin with determining the applicable standard of review. The State argues the Sixth District's decision is entitled to AEDPA deference. (ECF #14 at PageID 119). Mr. Brown responds a state-court decision is entitled to AEDPA deference only when it rules on the merits of a federal constitutional claim and the Sixth District's reliance on invited error means the court did not reach the merits of Ground One, thus de novo review applies. (ECF #20 at PageID 1158-59; *see also* ECF #20-2 at PageID 1221).

I agree with Mr. Brown. The Sixth Circuit has previously rejected applying AEDPA deference to a Michigan appellate court's decision applying Michigan's invited-error doctrine to decline reaching the merits of a challenge to allegedly involuntary statements. *See Cooper v. Chapman*, 970 F.3d 720, 729-30 (6th Cir. 2020). In opting instead for de novo review, the Sixth Circuit wrote:

> The appellate court avoided assessing the merits of Cooper's challenge of the March 3 statements by ruling instead that his challenge was procedurally defaulted under Michigan's invited-error doctrine. Because the state appellate court made no determination on the merits of Cooper's constitutional challenge to the March 3 interview, this court applies *de novo* review to the harmless error question presented on appeal here.

*Id.* at 730. The Michigan appellate court had ruled as follows:

> [Cooper] then made a second strategic choice in introducing the videotape of this interview in an effort to show the jury the apparent coerciveness of the police. These strategic choices were ultimately unsuccessful, and [Cooper] now objects to the admissibility of the March 3rd interview. Yet, appellate review is precluded because when a party invites the error, he waives his right to seek appellate review, and any error is extinguished.

*Michigan v. Cooper*, No. 304610, 2013 WL 2223896, at *4 (Mich. Ct. App. May 21, 2013) (citation and quotation marks omitted).

Here, just like the Michigan court, the Sixth District relied on the invited-error doctrine:

> {¶32} Ordinarily, we review the trial court's disposition of a defendant's allegation of juror misconduct for an abuse of discretion. However, in this case, we need not determine whether the trial court abused its discretion in failing to declare a mistrial, because we find that any error associated with such inaction was invited by appellant.

(ECF #14-1 at PageID 220). Because the Michigan appellate court's decision was reviewed de novo, the Sixth District's decision should also receive de novo review.

Under de novo review, Ground One is without merit. The Sixth Amendment guarantees a right to "a fair trial by a panel of impartial, indifferent jurors." *United States v. Perry*, 438 F.3d 642,

651 (6th Cir. 2006) (citation omitted). In *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court held that "unauthorized invasions" on the jury proceedings can oblige the trial court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 229-30.

"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). To justify a new trial, the defendant must prove at the *Remmer* hearing that the outside information caused actual prejudice. *Ewing v. Horton*, 914 F.3d 1027, 1030 (6th Cir. 2019). The mere occurrence of juror misconduct, extraneous information, or improper contact is not, without evidence of actual prejudice, enough to warrant a new trial. *In re Sittenfeld*, 49 F.4th 1061, 1066-67 (6th Cir. 2022). When a petitioner shows that extraneous information *may* have tainted the jury, due process requires the opportunity to show that the information *did* taint the jury to his detriment. *Ewing*, 914 F.3d at 1031.

In Mr. Brown's case, during deliberations, the jury wrote a note to the trial court, asking whether it was permissible for them to access the internet from their mobile phones for the purpose of ascertaining the definition of "access" as it appeared in the jury instructions, which the court was going to deny. (ECF #15-1 at PageID 987-88). The court then received a question asking about the ramifications if they did so. (*Id.* at PageID 989). The court, the State, and Mr. Brown discussed the matter and the State requested a *Remmer* hearing. (*See id.* at PageID 993-98). The court questioned the jury members, who confirmed they could not agree on the definition of "access" so one juror looked the word up in an online dictionary and in the Revised Code, and

then several jurors discussed the word's meaning. (*Id.* at PageID 993-95). Each juror confirmed they had not done any other research. (*Id.* at PageID 995-97).

The trial court and counsel then discussed how to proceed, with the State suggesting dismissing the corrupting count. (*Id.* at PageID 998-99). The trial court gave Mr. Brown the opportunity to confer with his counsel in private. (*Id.* at PageID 999-1000). After a 10-15-minute discussion, Mr. Brown's counsel advised him to request a mistrial as to all charges, but Mr. Brown requested the jury deliver a verdict on the six sex offenses and the corrupting charge be dismissed. (*See id.* at PageID 1000-01). The trial court confirmed Mr. Brown's wishes and verified he had enough time to discuss with his counsel and think on the decision. (*Id.* at PageID 1001-02). The court then dismissed the corrupting count and instructed the jury to deliberate only on the remaining six charges. (*Id.* at PageID 1003-04).

Based on these facts, Mr. Brown has not demonstrated how his right to a fair trial was prejudiced. The transcripts detail that prejudice was detected, a *Remmer* hearing was held to determine the extent of the jurors' research, Mr. Brown was afforded time to come to an informed decision with the aid of his appointed counsel as to how to best deal with that prejudice, and the trial court resolved the prejudice in the manner Mr. Brown desired by dismissing the corrupting count. Mr. Brown does not demonstrate how he was prejudiced by receiving the precise relief he sought, particularly when he ignored his counsel's advice to seek a mistrial as to all charges. There is no indication that the jury's research "set the tone" for deliberations on the other counts or was connected to an adverse verdict on those counts. *See Nevers v. Killinger*, 169 F.3d 352, 373 (6th Cir. 1999), *abrogated on other grounds by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000). Rather the

situation here fell far short of actual prejudice particularly where Mr. Brown was afforded a *Remmer* hearing and a choice of remedy.

Mr. Brown argues he was forced into "a Hobson's choice between defying his counsel's professional advice or continue to an outcome that has no remedy if the wrong choice is made." (ECF #20 at PageID 1162). Mr. Brown explains:

> That while represented by counsel, petitioner cannot be expected to make the ultimate decision about a mistrial in the context of a right that is rooted in self-representation and then be barred by the doctrine of invited error from arguing on appeal that he was prejudiced by that decision made against his counsel's advice.

(*Id.* at PageID 1163). But he had a real choice between a mistrial (and the uncertainty of a retrial) or the dismissal of one of seven charges. His arguments that either (1) his counsel should have overcome Mr. Brown's own opposition to a mistrial or (2) the trial court should have disregarded Mr. Brown's agency and ordered a mistrial anyway do not create actual prejudice from his own decision to proceed to verdict on the remaining counts with the original jury.

I thus recommend the District Court **DENY** Ground One as meritless.

### B. Ground Two raising ineffective assistance of trial counsel is without merit.

In Ground Two, Mr. Brown argues his trial counsel was ineffective for not seeking a limiting instruction after Mr. Brown acknowledged during his testimony that he was in pretrial detention. (ECF #1 at PageID 7). The State argues the Sixth District reasonably rejected his claim on direct appeal and that decision was not contrary to clearly established federal law. (*See* ECF #14 at PageID 124).

The Sixth District ruled on Mr. Brown's ineffective-assistance claim on direct appeal:

> {¶21} On direct examination, appellant revealed that he had filed a complaint for divorce from S.B., but had not yet obtained the divorce because "I missed both my court dates since I have been in jail . . . ." This comment prompted the state to seek a sidebar conference, at which the state voiced its concern over appellant revealing

29

the fact that he was incarcerated. The state argued that this comment constituted invited error, and appellant's defense counsel agreed. Ultimately, the trial court offered to provide the jury with a limiting instruction, but defense counsel rejected the offer, electing instead to "leave it alone."

\* \* \*

{¶37} In his second assignment of error, appellant argues that he received ineffective assistance of trial counsel.

{¶38} To demonstrate ineffective assistance of counsel, appellant must first show that trial counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because "effective assistance" may involve different approaches or strategies, our scrutiny of trial counsel's performance "must be highly deferential" with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689. Should appellant demonstrate her trial counsel's performance was defective, appellant must also demonstrate that prejudice resulted. *Bradley* at paragraph two of the syllabus.

{¶39} Here, appellant's ineffective assistance argument is premised upon counsel's decision not to have the trial court provide a limiting instruction after he made a passing reference to the fact that he was in jail during the pendency of the divorce proceedings involving S.B. As noted above in our recitation of the facts, the trial court offered to provide the jury with a limiting instruction, but defense counsel rejected the offer, electing instead to "leave it alone" so that the issue would not be reiterated and emphasized a second time to the jury.

{¶40} "Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel." *State v. Hester*, 10th Dist. Franklin No. 02AP-401, 2002-Ohio-6966, ¶ 10, citing *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). In *Hester*, the Tenth District rejected an argument that trial counsel was ineffective for failing to request a limiting instruction relating to the jury's consideration of the defendant's prior convictions, and explained that "[c]ounsel may have declined to request a limiting instruction regarding appellant's prior convictions out of concern that, if such an instruction were given, the prior convictions would be once again called to the jury's attention." *Id.* at ¶ 15.

{¶41} Our review of the record in this case confirms that a similar desire, namely wanting not to draw attention to appellant's passing reference to his incarceration, motivated appellant's trial counsel to reject a limiting instruction. This tactical decision, which was reasonable in light of the circumstances, does not give rise to a claim of ineffective assistance of trial counsel. Moreover, appellant does not establish how he was prejudiced by trial counsel's decision not to seek a limiting instruction.

There is nothing in the record that would support the notion that the jury was influenced by appellant's admission that he was in jail during the pendency of his divorce proceedings.

{¶42} Because appellant has failed to demonstrate that his trial counsel's representation fell below an objective standard of reasonableness, and in light of the fact that appellant does not explain how he was prejudiced by counsel's failure to request a limiting instruction, we find no merit to appellant's ineffective assistance argument. Accordingly, appellant's second assignment of error is not well-taken.

(ECF #14-1 at PageID 215, 221-23; *see also Brown*, 2021 WL 1943266, at *3, *6-7). This decision ruled on the merits of Mr. Brown's federal claim and is thus entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d); *Durr*, 487 F.3d at 432.

As noted earlier, AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell*, 543 U.S. at 455 (citation and quotation omitted). Accordingly, Mr. Brown must demonstrate the Sixth District's adjudication of his ineffective-assistance claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *See* 28 U.S.C. § 2254(d).

The familiar two-part test in *Strickland v. Washington*, 486 U.S. 668 (1984), is the clearly established federal law governing ineffective-assistance claims. This standard requires the habeas petitioner establish (1) counsel's representation fell below an objective standard of reasonableness based on all the circumstances in the case, such that the attorney did not function as "counsel" guaranteed by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

31

To satisfy the deficiency prong, the habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 668. Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. This is an extremely deferential standard, because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

To satisfy the prejudice prong, the habeas petitioner must show "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome." *Id.* at 694. Additionally, the inquiry "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A trial is not unreliable or fundamentally unfair if the alleged ineffectiveness "does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.*

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. *See Harrington*, 562 U.S. at 105. The standards created by *Strickland* and § 2254(d) are both highly deferential, *see Strickland*, 486 U.S. at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly so." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). The *Strickland* standard is a general one, so the range of reasonable applications is substantial. *Mirzayance*, 556 U.S. at 123. Additionally, unreasonableness

under *Strickland* is not the same as unreasonableness under § 2254(d). *Harrington*, 562 U.S. at 105. When § 2254(d) applies, the question is not whether counsel's actions were reasonable; rather the question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Id.*

A review of the record demonstrates the Sixth District's decision was not contrary to the *Strickland* standard. The court cited *Strickland* and an Ohio case that quoted *Strickland*. (ECF #14-1 at PageID 221). The court then concluded the decision of Mr. Brown's counsel not to seek a limiting instruction was a reasonable tactical decision in the circumstances, intended to avoid inadvertently emphasizing Mr. Brown's custodial status to the jury, and thus was not ineffective assistance. (*Id.* at PageID 222-23). The *Strickland* Court noted that because "[t]here are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way[,]" a proper ineffective-assistance claim "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 486 U.S. at 689 (cleaned up). It was thus not "contrary" to *Strickland* for the Sixth District to defer to the heat-of-the-moment decision of Mr. Brown's trial counsel to elect against seeking a limiting instruction. *See Williams*, 529 U.S. at 405 (holding a state-court decision is "contrary" to a Supreme Court decision when it is "diametrically different, opposite in character or nature, or mutually opposed"). This is particularly so where the Sixth Circuit has observed limiting instructions "inevitably invite the jury's attention to matters the defendant normally prefers not to emphasize." *Ferguson v. Knight*, 809 F.2d 1239, 1243 (6th Cir. 1987).

The Sixth District also did not unreasonably apply *Strickland* to the facts of Mr. Brown's case. Mr. Brown remarked on his custodial status while he took the stand in his own defense. On direct examination, Mr. Brown was asked about his relationship with his family around the time of the offenses:

| Question: | Now [Mr. Brown], when you decided to move out, what was your relationship with [A.K.] at that time? |
| --- | --- |
| Mr. Brown: | It was normal father, daughter relationship I thought. |
| Question: | Was she aware at some point through your contact with her that you were intending to divorce her mother? |
| Mr. Brown: | I believe so. Because I actually posted on Facebook once and they knew little details of my life. I never really aired my dirty laundry out but— |
| Question: | Did you eventually file for divorce? |
| Mr. Brown: | Yes, sir. |
| Question: | You have not obtained a divorce though from her as of today though, correct? |
| Mr. Brown: | No, I missed both my court dates since I have been in jail, November 4th and January 8th. |

(ECF #15-1 at PageID 882).

The State objected three questions later and the court held the following sidebar:

| Prosecutor: | Judge, I'm not objecting to this particular question, but I wanted to approach the Bench because [Mr. Brown] testified that he's in custody and I would argue that is invited error because there's no inference to the extent that— |
| --- | --- |
| Defense Counsel: | That's fine, that's fine. |
| Prosecutor: | I don't know if the Court wants to go through instruction or just let it go. |
| The Court: | Well, I will ask [Defense Counsel], I would say to say something further, just could re-emphasize it. But what would you care I do? |

| Defense Counsel: | Well since they overheard that information, I would not dispute that it's invited error as far as any issue that could be raised since it was. |
| The Court: | Do you want the Court to advise the Jury of that aspect and refrain using it? |
| Defense Counsel: | Yeah. |
| The Court: | So, you do want me to? |
| Defense Counsel: | No, I do not want you to. I would leave it alone. |
| The Court: | And no instruction. |
| Defense Counsel: | No instruction. |

(ECF #15-1 at PageID 883-84). Based on these facts, it was not unreasonable for the Sixth District to conclude Mr. Brown's counsel was exercising his professional judgment by not seeking a limiting instruction.

I thus recommend the District Court **DENY** Ground Two as meritless.

**C.      Ground Three raising the evidence against him was legally insufficient is without merit.**

In his third ground for relief, Mr. Brown argues he was denied due process because his conviction was not supported by sufficient evidence. (ECF #1 at PageID 8). The State argues the Sixth District's decision on direct appeal is entitled to AEDPA deference and the court reasonably determined the merits of his claim. (ECF #14 at PageID 128-29).

The Due Process clauses in the Fifth and Fourteenth Amendments require the State prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship*, 397 U.S. 358, 363-64 (1970). In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court established the standard for whether the evidence is legally sufficient to support a conviction:

[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Id.* at 319. Otherwise stated, a petitioner is entitled to habeas corpus relief if, based on the record evidence at trial and in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *See id*. at 324.

*Jackson* claims face a high bar in federal habeas proceedings because of two layers of deference. First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 565 U.S. 1, 2 (2011) (per curiam). And second, because of AEDPA deference in habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *See id.* (quoting *Renico v. Lett,* 559 U.S. 766, 773 (2010)). The Sixth Circuit has aptly described this standard as imposing a "nearly insurmountable hurdle." *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (quotation omitted).

The Sixth District ruled on Mr. Brown's sufficiency-of-the-evidence argument as follows:

{¶45} In this case, appellant was convicted of two counts of rape in violation of R.C. 2907.02(A)(1)(b) and two counts of rape in violation of R.C. 2907.02(A)(2). R.C. 2907.02 provides, in relevant part:

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

\* \* \*

36

> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
>
> * * *
>
> (2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

{¶46} At trial, the state introduced evidence by way of A.K.'s testimony to prove the four counts of rape for which appellant was convicted. With respect to the two counts of rape in violation of R.C. 2907.02(A)(1)(b), A.K. testified that appellant, on more than one occasion, took her into the recreation room at T.M.'s home and inserted his inhaler into her vagina. This testimony is sufficient to establish the "sexual conduct" element of R.C. 2907.02(A)(1)(b), as "sexual conduct" is defined under R.C. 2907.01(A) to include "the insertion, however slight, of * * * any instrument, apparatus, or other object into the vaginal or anal opening of another."

{¶47} As to how old A.K. was at the time appellant engaged in the foregoing sexual conduct with her, S.B. testified that the family moved into T.M.'s home in late 2013, and subsequently moved into the Chase Street apartment in May or June 2014. Therefore, the sexual conduct occurred prior to June 2014. A.K., who was born in January 2003, would have been 11 years old at this time. Thus the state's evidence was sufficient to prove that A.K. was under the age of 13 when appellant engaged in sexual conduct with her at T.M.'s home, as required under R.C. 2907.02(A)(1)(b).

{¶48} The two remaining rape counts under R.C. 2907.02(A)(2) were based upon incidents that occurred after the family moved into the Chase Street apartment, and after A.K.'s thirteenth birthday. In support of these charges, the state elicited testimony from A.K., who recounted two occasions in which appellant forced her to have intercourse with him. A.K. described the incidents in detail, indicating that appellant placed a towel underneath her, had her undress, inserted a vibrator into her vagina, and then engaged in intercourse with her. A.K. specified that this occurred on two occasions, and she further testified that appellant routinely rubbed his penis in and around the folds of her vagina as he masturbated.

{¶49} As to the force element under R.C. 2907.02(A)(2), the Ohio Supreme Court has indicated:

> The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength.

*State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of the syllabus. In *Eskridge*, the court went on to recognize that coercion is inherent in the parent-child relationship and stated that "force need not be overt and physically brutal, but can be subtle and psychological." *Id.* at 58-59. The relaxed standard regarding the force element that was espoused by the court in *Eskridge* has been deemed applicable to stepparents of a minor, such as appellant in this case. *State v. Riffle*, 110 Ohio App.3d 554, 561, 674 N.E.2d 1214 (9th Dist.1996).

{¶50} Notably, appellant does not assert that the state's evidence was insufficient on the force element. During her testimony, A.K. explained that appellant's demands for sexual conduct made her feel "stuck." She elaborated that appellant would get upset if she refused his sexual advances, and therefore she elected to simply comply. This testimony is sufficient to establish that appellant exerted psychological force over A.K., his 13-year-old stepdaughter, prior to engaging in sexual conduct with her.

{¶51} In advancing his sufficiency argument, appellant does not challenge the existence of the state's evidence as to each of the elements of the offenses for which he was convicted. Rather, appellant points to A.K.'s delayed disclosure of abuse, S.B.'s failure to take action in response to such disclosures, and T.M.'s testimony that he never observed any indicators of sexual abuse to support his assertion that A.K. was lying when she accused him of raping her. In essence, appellant challenges the credibility of the rape allegations made by A.K. However, in reviewing whether the state's evidence is sufficient to support appellant's convictions, "[w]e neither weigh the evidence nor consider the credibility of the witnesses." *State v. Frost*, 6th Dist. Sandusky No. S-19-040, 2021-Ohio-457, ¶ 22, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. Therefore, we find appellant's credibility arguments misplaced in this context.

{¶52} Having examined the evidence introduced by the state at trial, and upon viewing it in a light most favorable to the state, we find that a rational trier of fact could have found the essential elements of the rape offenses for which appellant was convicted proven beyond a reasonable doubt. Accordingly, we hold that the state's evidence was sufficient to support appellant's convictions, and we find appellant's third assignment of error not well-taken.

(ECF #14-1 at PageID 223-27; *see also Brown*, 2021 WL 1943266, at *7-8).

Nothing in the Sixth District's analysis supports a conclusion that the court either unreasonably applied Supreme Court precedent or unreasonably determined the facts in light of the evidence at trial. As the Sixth District recounted, A.K.'s testimony related multiple instances that rise to "sexual conduct" as defined by Ohio law. (*See* ECF #15-1 at PageID 697-98, 708-10,

713-15). Though A.K. did not expressly testify about the dates of the sexual contacts, she did testify to her date of birth and the location of the sexual contacts (*id.* at PageID 693-94, 697, 710, 713), while her mother testified to the approximate dates A.K. lived at those locations (*see id.* at PageID 775-76, 782). From these, the jury could reasonably deduce A.K. was under age 13 at the time of the sexual contacts. Additionally, A.K. testified to feeling "stuck" by Mr. Brown's sexual advances (*id.* at PageID 698-99, 713), which the Sixth District explained is sufficient to establish the element of force under Ohio law for a parental rape (ECF #14-1 at PageID 225-26). Viewing these facts in the light most favorable to the State, a rational jury could find all the elements of rape under Ohio law proven beyond a reasonable doubt. *See Jackson,* 443 U.S. at 324.

Mr. Brown's supporting facts primarily challenge the credibility of the witnesses against him. (*See* ECF #1 at PageID 8) ("This case was a 'she said, he said' case. There was no evidence upon which the jury could rely to reach a decision to convict beyond a reasonable doubt where credibility is paramount . . . "). Credibility plays no part in an inquiry into the sufficiency of the evidence. *See Schlup* 513 U.S. at 330 (the inquiry "looks to whether there is sufficient evidence which, *if credited*, could support the conviction"). If the court credits the evidence laid out by the Sixth District, it was sufficient to convict Mr. Brown of rape.

I thus recommend the District Court **DENY** Ground Three as meritless.

### D.  Ground Four raising ineffective assistance of appellate counsel is without merit.

In Ground Four, Mr. Brown argues his appellate counsel was ineffective for not raising on appeal that his trial counsel was ineffective for (1) not impeaching A.K. with video evidence of prior inconsistent statements, (2) not impeaching A.K. with her prior medical records, (3) not objecting to the exclusion of probative evidence under Ohio Evidence Rule 404, (4) not objecting

to jury foreman being the alternate juror, and (5) employing a strategy that permeated the entire trial with unfairness. (*See* ECF #1 at PageID 10). The State argues the Sixth District reasonably rejected Mr. Brown's claims in denying his Appellate Rule 26(B) application and that decision was not contrary to clearly established federal law. (*See* ECF #14 at PageID 135). Mr. Brown replies that the Sixth District unreasonably determined the facts when the court stated Mr. Brown "does not assert, and the record does not support, any claim that [S.B.2] was the actual perpetrator of the rapes at issue in this case, and evidence of [S.B.2]'s conviction involving a different victim is irrelevant." (ECF #20 at PageID 1135) (quoting ECF #14-1 at PageID 313).

The Sixth District ruled on Mr. Brown's Appellate Rule 26(B) application in relevant part:

> Here, appellant proposes the following assignments of error that he alleges should have been raised by appellate counsel in his direct appeal:
>
> 1.  Trial counsel failed to utilize the video evidence of prior statements to impeach the state's key witnesses presented at trial.
>
> 2.  Trial counsel failed to utilize medical records to impeach the state's witnesses presented at trial.
>
> 3.  Trial counsel failed to object to the exclusion of probative evidence in violation of Evid.R. 404.
>
> 4.  Trial counsel failed to object to other acts of evidence [under] Evid.R. 404(B).
>
> 5.  Trial counsel failed to object to the alternate juror being the jury foreman.
>
> 6.  Trial counsel's strategy was so ill chosen that it permeated the entire trial with error of constitutional magnitude.
>
> In each of appellant's proposed assignments of error, he argues that his appellate counsel was ineffective for failing to raise an argument of ineffective assistance of trial counsel. In his first assignment of error, appellant contends that trial counsel was ineffective for failing to utilize video evidence of the victim's pretrial interviews to impeach the victim at trial. Similarly, appellant argues in his second assignment of error that trial counsel was ineffective for failing to introduce the results of the

victim's medical exam to refute her claim that appellant raped her when she was 11 years old.

Our review of the record reveals that trial counsel did, in fact, reference the victim's prior statements during cross examination of the victim. Moreover, the results of the victim's medical exam, namely that the victim's hymen was still intact, did not preclude the finding that appellant raped the victim. Therefore, we find no merit to [Mr. Brown]'s argument that his appellate counsel was ineffective for failing to present the foregoing evidence. Accordingly, appellant's first two proposed assignments of error are not well-taken.

In his third proposed assignment of error, appellant argues that his trial counsel was ineffective for failing to object to the exclusion of the victim's videotaped statement revealing that her friend was raped by an individual named [S.B.2] around the same time as she was raped. Appellant does not assert, and the record does not support, any claim that [S.B.2] was the actual perpetrator of the rapes at issue in this case, and evidence of [S.B.2]'s conviction involving a different victim is irrelevant.

Because the evidence concerning [S.B.2]'s rape conviction was not relevant in this case, and was therefore inadmissible, we do not find that trial counsel was ineffective in failing to object to the trial court's exclusion of it. By extension, we find no merit to appellant's argument that appellate counsel was ineffective in failing to raise an ineffective assistance argument concerning the exclusion of this evidence. Accordingly, we find appellant's third proposed assignment of error not well-taken.

In his fourth proposed assignment of error, appellant argues that trial counsel failed to object to other acts evidence, namely his wife's testimony that he gave her a sexually transmitted disease. According to appellant, this testimony was untruthful. Having reviewed the record, we find that the admission of this testimony was not prejudicial to appellant. Indeed, as noted by the state, the witness acknowledged on cross examination that she believed she contracted the sexually transmitted disease through an extramarital affair, not from appellant. As such, the admission of this evidence was harmless and appellant's trial counsel was not ineffective for failing to object to it. Accordingly, we find appellant's fourth proposed assignment of error not well-taken.

In his fifth proposed assignment of error, appellant contends that trial counsel was ineffective for failing to object to the alternate juror being designated as the jury foreperson. The alternate juror was seated in this case due to one of the regular jurors becoming ill after the jury had already begun its deliberations. After ensuring that the alternate juror had not discussed the case with anyone, the trial court seated the alternate juror and instructed the jury to restart its deliberations.

R.C. 2945.29 authorizes the trial court to discharge a regular juror who becomes ill and unable to perform the duties of a juror, and to then designate an alternate juror

to take the ill juror's place. Crim.R. 24(G) requires the trial court to instruct the jury to begin its deliberations anew upon the seating of an alternate juror and vests the alternate juror with "the same functions, powers, facilities, and privileges as the regular jurors."

Here, [Mr. Brown] does not contest the trial court's conformity with R.C. 2945.29 and Crim.R. 24(G), but instead argues that the alternate juror who was seated should not have been permitted to serve as the jury foreperson. Appellant cites no authority to support his argument. Further, appellant's argument is refuted by the plain language of Crim.R. 24(G) quoted above, which permitted the alternate juror in this case to serve in the same manner as the regular juror who was discharged, including as the foreperson. As such, trial counsel was not ineffective for failing to object to the alternate juror serving as the foreperson, and we find appellant's fifth proposed assignment of error not well-taken.

In his sixth proposed assignment of error, appellant argues that trial counsel's strategy was "so ill chosen that it permeated the entire trial with error of constitutional magnitude." In essence, appellant argues that the foregoing alleged errors combined to render his trial counsel's performance ineffective. This argument is akin to the cumulative-error doctrine, which provides that a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal. Here, appellant cannot point to numerous instances of error on the part of his trial counsel, and thus his argument fails. Accordingly, we find his sixth proposed assignment of error not well-taken.

(ECF #14-1 at PageID 310-16) (citations and quotation marks omitted). This decision determined

the merits of Mr. Brown's federal claim and thus receives AEDPA deference. *See* 28 U.S.C.

§ 2254(d); *Durr*, 487 F.3d at 432.

As discussed above concerning Ground Two, Mr. Brown must demonstrate the Sixth

District's adjudication of his ineffective-assistance claim either (1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established federal law; or

(2) resulted in a decision that was based upon an unreasonable determination of the facts. *See*

28 U.S.C. § 2254(d). Again, the two-part test in *Strickland* is the clearly established federal law

applicable here. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (applying *Strickland* to appellate

counsel). Thus, Mr. Brown must show his appellate counsel's representation was objectively

42

unreasonable and prejudiced the defense. 466 U.S. at 687-88. This remains a high burden, particularly given the doubly deferential review standard. *See Harrington*, 562 U.S. at 105; *Mirzayance*, 556 U.S. at 123.

Mr. Brown argues in his Traverse that the Sixth District unreasonably determined the facts of his third claim: that his appellate counsel was ineffective for not raising his trial counsel's failure to object to the exclusion of A.K.'s prior statements about being victimized by a second man. (ECF #20 at PageID 1134-35). Specifically, Mr. Brown argues the Sixth District unreasonably determined "Petitioner 'does not assert, and the record does not support, any claim that [S.B.2] was the actual perpetrator of the rapes at issue in this case, and evidence of [S.B.2]'s conviction involving a different victim is irrelevant.'" (*Id.* at PageID 1135) (quoting ECF #14-1 at PageID 313). He explains he reviewed Det. Trevino's recorded interview of A.K. and "A.K. specifically said when she was telling Detective Trevino about how her friend Shawntea was raped and had a baby by S.B.2, A.K. then said 'me too.'" (ECF #20 at PageID 1135) (citing ECF #14-1 at PageID 284). But Mr. Brown does not state whether the Sixth District's wrongly determined Mr. Brown did not advance S.B.2 as an alternative perpetrator or that the record does support such a theory.

The Sixth District was incorrect in stating Mr. Brown did not advance S.B.2 as an alternative suspect. Mr. Brown did so expressly in his application. (ECF #14-1 at PageID 288) (" . . . the trial court abused its descretion [*sic*] when excluding evidence aboute [*sic*] [S.B.2] being the one who raped my daughter . . . ."). But that one mischaracterization does not entitle Mr. Brown to habeas relief because § 2254(d)(2) requires the state court's adjudication be "based on" the unreasonable determination of facts. *See Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) ("[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the

43

petitioner must show that the resulting state court decision was 'based on' that unreasonable determination."). The Sixth District's determination that Mr. Brown's appellate counsel was not ineffective was based on its conclusion that S.B.2's prior conviction for an unrelated rape was inadmissible under Ohio evidence law to inculpate him for the rapes Mr. Brown was charged with. (*See* ECF #14-1 at PageID 314) ("Because the evidence concerning [S.B.2]'s rape conviction was not relevant in this case, and was therefore inadmissible, we do not find that trial counsel was ineffective in failing to object to the trial court's exclusion of it."). The state court's decision on state law is usually unreviewable on federal habeas review, and that is "especially so" for rulings admitting or excluding evidence. *See Bailey v. Lafler*, 722 F.App'x 425, 435 (6th Cir. 2018) (regarding comparable Michigan evidence law).

Moreover, the Sixth District's conclusion the record does not support a theory that S.B.2 was an alternative suspect was not unreasonable in light of the testimony of both A.K. and Det. Trevino. As discussed regarding Mr. Brown's actual-innocence claim, "me too" can mean that A.K. was (1) victimized by another man instead of by Mr. Brown, (2) victimized by another man in addition to being victimized by Mr. Brown, or (3) victimized, but not by S.B.2. However, A.K.'s testimony at trial describing being victimized multiple times by Mr. Brown and not S.B.2 renders the first meaning unlikely. It was thus not unreasonable for the Sixth District to determine the record did not support a theory that S.B.2 was an alternative perpetrator.

Finally, the Sixth District's decision was not contrary to clearly established federal law under the doubly deferential standard of review. An appellate counsel does not have to raise every non-frivolous claim to be effective. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). To establish appellate counsel was ineffective for omitting a claim, the petitioner must show "a particular nonfrivolous

44

issue was clearly stronger than issues that counsel did present." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). The Sixth District noted Mr. Brown's trial counsel referenced the victim's prior statements when cross examining the victim, despite Mr. Brown's claim to the contrary. (ECF #14-1 at PageID 313). The Sixth District also noted the victim's medical exam was not relevant to the elements of rape under Ohio law. (*Id.*). Then the Sixth District dismissed Mr. Brown's remaining claims as without merit under Ohio law. (*Id.* at PageID 313-16).

I thus recommend the District Court **DENY** Ground Four as meritless.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a COA and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has determined a petitioner's constitutional claim to be without merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether (i) the petition states a valid claim of the denial of a constitutional right and (ii) the district court was correct in its procedural ruling. *Id.* A showing that the appeal would succeed on the claim is not required to grant a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Mr. Brown has not demonstrated that jurists of reason would find it debatable whether his petition states a valid claim of the denial of his constitutional rights. Therefore, I recommend the District Court **DENY** Mr. Brown a COA as to any ground.

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons, I recommend the District Court **DISMISS** Ground Five as procedurally defaulted, **DENY** Grounds One through Four as meritless, and **DISMISS** the petition. Finally, I recommend the District Court **DENY** Mr. Brown a certificate of appealability as to all grounds.

Dated: March 5, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir.**

1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).